Kurt ALTMAN, M.D., Plaintiff,

v.

NEW YORK CITY HEALTH AND HOS-PITALS CORPORATION, Metropolitan Hospital Center, Billy E. Jones, M.D., President, New York City Health and Hospitals Corporation, and Dennis A. Gowie, Executive Director, Metropolitan Hospital Center, Defendants.

94 Civ. 736 (JSM).

United States District Court,
S.D. New York.

Sept. 28, 1995.

Pearl Zuchlewski, Goodman & Zuchlewski, New York City, for plaintiff.

John P. Woods, Office of Corporation Counsel of City of New York, New York City, for defendants.

## OPINION AND ORDER

MARTIN, District Judge:

Plaintiff, a recovering alcoholic who has worked at Metropolitan Hospital Center ("Metropolitan" or "the hospital") for approximately 40 years, has brought claims against the hospital and the other defendants under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and under § 296 of New York's Executive Law. His claims arise from the refusal of the hospital to reinstate him as Chief of the hospital's Department of Internal Medicine approximately three months after he had been found visibly drunk while treating a patient, but after he had completed a one-month in-patient treatment program and had entered a recovery program sponsored by the State Medical Society. These claims are now before the court on the parties' cross-motions for summary judgment. For the reasons given below, plaintiff's motion is denied and defendants' motion is granted.

## BACKGROUND

Since some familiarity with Metropolitan's administrative hierarchy is necessary for an understanding of the issues raised in this lawsuit, an overview of that hierarchy is provided before the facts of the case are discussed.

### Metropolitan Hospital

New York's Health and Hospitals Corporation ("HHC") is a public benefit corporation which operates New York's municipal hospitals. Metropolitan is a member institution of HHC. It has approximately 500 beds and primarily serves the population of East Harlem. Altman Dep. at 160; *see* Stone Dep. at 119–20.

Metropolitan's Executive Director is responsible for the overall management of the hospital, and reports directly to the President of HHC. Gowie Dep. at 20–21. The Executive Director from 1987 through July 1993 was defendant Dennis Gowie, and the President of HHC from 1992 through 1994 was defendant Billie E. Jones, M.D. Gowie Dep. at 19–20; Jones Dep. at 43; Pl.'s Ex. 26.

Through an affiliation agreement with New York Medical College ("the College"), a private institution, Metropolitan is supplied with physicians and other professional staff who oversee both the provision medical care at Metropolitan and the hospital's residency programs. *See* Adler Dep. at 10–11. However, assignments to several positions, including Metropolitan's Medical Director and the heads of the hospital's 19 clinical departments (the "Chiefs of Service"), are made by the President of HHC upon recommendation of the Executive Director, after having been nominated by the Dean of the College. Adler Dep. at 267–69; Gowie Dep. at 22–23. The President has final authority to determine the status of Chiefs of Service. *See* Jones Dep. at 91.

Metropolitan's Medical Director has ultimate responsibility for medical care at the hospital. His duties include supervising the Chiefs of Service, serving as the Executive Director's chief medical advisor and overseeing staff compliance with hospital policy, medical education and research in the hospital, and the credentialing of medical and residential staff. Stone Dep. at 167–72. Since 1989, the Medical Director has been Dr. Richard Stone, who also serves as the Assistant Dean of New York Medical College. *Id.;* Pl.'s Ex. 12, ¶ 1.

The Chiefs of Service each supervise the provision of care to the patients of a particular clinical department by the Department's staff. In addition to this supervisory responsibility, it is the Chief's duty to ensure that the Department's "quality assurance" program is properly implemented and to oversee the recruitment, hiring, assignment, evaluation and discipline of physicians within the Department, as well as the evaluation of the remainder of the Department's medical staff and of residents and medical students within the Department. *See* Defs.' Ex. F (Functional Position Description); Altman Dep. at 160–76.[1]

Reporting to the Chief of each Department are the Chiefs of various specialized "sections" within the Department, and below the Section Chiefs are attending physicians, who oversee residents and treat patients. Gowie Dep. at 23–25; Jones Dep. at 173–75. In the Department of Internal Medicine (the "Department of Medicine" or "Department"), the clinical Department in which plaintiff has worked throughout his career at Metropolitan, attending physicians are assigned to "ward attending" duty in rotations of between two and three months per year: the "ward attending" physician is the physician of record for between 15 and 25 of the Department's patients, and oversees the treatment of these patients by a team of residents and interns. Altman Dep. at 41–43, 149; Stone Dep. at 139–42. The two- or three-month rotation system is necessary because "ward attending" duty is "very labor-intensive" and, often, quite stressful. *See* Stone Dep. at 140, 143. When an attending physician is not on "ward attending" duty, the tasks he performs include treatment of clinic

---

1. The Chief also helps to develop the Department's budget and ensures that the Department's personnel are properly credentialed and that the Department's residency program meets applicable educational requirements. Joint Ex. 3–F.

patients, supervision of residents and medical students, and, at least in plaintiff's case, covering the employee health care service. *Id.* at 143.

*Dr. Altman's Removal from the Chief of Service Position*

Dr. Altman has worked at Metropolitan since his residency there in 1958. *See* Defs.' Exs. A, B. Until two years ago, he had gradually risen through the ranks of the hospital's Department of Internal Medicine, with his career reaching its culmination when he was appointed Chief of Service for the Department ("Chief of Medicine") in 1991. *Id.*

Dr. Altman had also, from the time he was a resident through the 1980's, had a drinking problem of gradually increasing severity. What began as occasional excess consumption of alcohol at staff parties in the 1960's grew, during the 1970's, into a series of drinking "binges" that lengthened, and involved the consumption of increasingly excessive amounts of alcohol, as the years passed. Altman Dep. at 54–76, 216–21.[2] Moreover, Dr. Altman was, by early 1986, addicted to esgic, a barbiturate which had been prescribed to him for headaches in August or September of the previous year. *Id.* at 89–93, 447–55.[3]

Plaintiff was admitted to Roosevelt Hospital ("Roosevelt") from February 27, 1986 through March 6 of that year and was treated for his dependence on alcohol and on esgic. *See* Defs.' Ex. P at 1–37. He returned to work soon after leaving Roosevelt, and no one at Metropolitan discussed the reason for his absence with him after his return; nor is there any evidence that anyone, other than the Chief of Medicine at the time, knew why he had been absent. Altman Dep. at 116–23, 222–25.[4]

Plaintiff states that he did not drink any alcohol after his 1986 detoxification until he consumed a glass of wine at a staff social function in the spring of 1992. *Id.* at 130, 221–22. From that time forward, however, he once again drank regularly, and the amount he drank quickly increased. *Id.* at 227–60. Concerned, he made an abortive effort to stop drinking in July; but on a vacation to Europe that August with his wife and son, he began consuming massive amounts of alcohol on a daily basis. *Id.* at 243–44, 270–85. When he returned to work in September, he began hiding bottles at home, taking librium in an attempt to detoxify himself, and, after about two weeks, drinking in the morning. *Id.* at 312–30. Plaintiff did not tell anyone at Metropolitan about his relapse. *Id.* at 286–91, 691.

At a staff meeting in late September, Dr. Stone and Karl Adler, M.D., the Dean of the Medical College, noticed that plaintiff was behaving strangely. Drs. Stone and Adler told two members of the Department's medi-

---

2. Dr. Altman estimates that a binge involved the consumption of a quart of vodka and a six-pack of beer per night, although the amount could sometimes be less or, as time passed, more. Altman Dep. at 75–76. He testified that his binges could last for up to three days. *Id.* After a binge, Dr. Altman would sometimes remain absent from work while struggling with a hangover, *id.* at 72–73; would sometimes return to work while using librium in an attempt to detoxify himself *id.* at 490–92, 498; and, as time passed, would sometimes drink in the morning in order to "stabilize" himself after drinking heavily the previous night, *id.* at 511–12.

3. Dr. Altman recalls that the drug affected his thought processes and caused depression, followed by agitation when the drug's effect wore off. Altman Dep. at 449–50.

4. The Chief of Medicine at the time, Karl Adler, M.D., knew that plaintiff had a drinking problem prior to the time that plaintiff was admitted to Roosevelt. Plaintiff had begun conferring with

Dr. Adler about plaintiff's alcohol abuse at some point during the mid–1980's. Adler Dep. at 21–34. Dr. Adler recalls first speaking with Dr. Altman about his drinking after smelling alcohol on plaintiff's breath at work and noticing that plaintiff had been taking long lunch breaks, *see id.;* plaintiff has no similar recollection, see Altman Dep. at 446. Dr. Adler stated that after learning of plaintiff's alcohol abuse, he and Dr. Maryann Cohen, a psychiatrist at Metropolitan, arranged for plaintiff to receive therapy from someone unaffiliated with the hospital. Adler Dep. at 23–26.

Dr. Adler subsequently became Dean of New York Medical College, in which capacity he nominated plaintiff for the position of Chief of Medicine in 1991. Neither Dr. Adler nor plaintiff mentioned plaintiff's history of substance abuse to defendant Gowie (or to the President of HHC) when plaintiff was nominated. *See* Adler Dep. at 61–62, 233–34; Altman Dep. at 222–25.

cal staff to observe plaintiff and report any further unusual conduct. Adler Dep. at 45–47; Stone Dep. at 13–15, 219–23. After receiving a call from one of these staff members on the afternoon of September 30, 1992, Dr. Adler immediately sent Dr. Stone to Metropolitan's Rheumatology Clinic. Adler Dep. at 69–71; Stone Dep. at 15–16.

There Dr. Stone found Dr. Altman visibly drunk while treating a patient. Stone Dep. at 16, 221–22. After inducing plaintiff to leave the clinic on a pretext, Dr. Stone met with plaintiff and with Dr. Adler; at the meeting, Stone and Adler immediately suspended plaintiff from his clinical duties at Metropolitan and told him that he would have to enter a treatment program "if there were any possibility of him returning to his position," and if he wished to avoid referral to the state licensing board on account of the incident. Adler Dep. at 71–73; Stone Dep. at 17–20. Plaintiff agreed to undergo treatment. Stone Dep. at 20.

Later that afternoon, Dr. Adler informed defendant Gowie of these events and, for the first time, *see supra* note 2, of plaintiff's drinking problem six years ago. Adler Dep. at 75. Gowie "expressed chagrin" that he had not, until then, been informed of plaintiff's prior history. Gowie Dep. at 55. He told Dr. Adler that Dr. Jones would have to make a final decision regarding plaintiff's status at Metropolitan. *Id.*

The next day, plaintiff entered Roosevelt for detoxification. He remained there until October 6, 1992, whereupon he reported to Smithers Alcoholism Treatment and Training Center ("Smithers") for in-patient treatment which lasted until November 3, 1992. *See* Defs.' Ex. P at 38–130. Plaintiff then entered a recovery program sponsored by the state Medical Society's Committee for Physicians' Health ("the Committee"), which included (1) sessions with a therapist; (2) participation in self-help groups; (3) urine monitoring; and (4), upon resumption of his duties at Metropolitan, "professional moni-

toring"[5] in the workplace. *See* Michels Aff. at 2; *id.* Ex. A.

During plaintiff's absence from Metropolitan, Drs. Adler and Stone spoke with plaintiff, his therapist and a representative of the Committee. Adler Dep. at 154–60; Stone Dep. at 33–45. On the basis of these conversations, Dr. Adler decided to allow plaintiff to return to his prior position as Chief of Medicine as of December 28, 1992, with Dr. Stone serving as plaintiff's "professional monitor." Dr. Adler then, without seeking or receiving Dr. Jones' approval, informed plaintiff of this decision. *See* Pl.'s Ex. 4; Gowie Tr. at 94–95.

Gowie and Dr. Jones learned of these developments on December 22, and Dr. Jones responded by postponing plaintiff's scheduled return date until January 4, 1993, so that Dr. Jones could review the matter personally. *See* Adler Dep. at 238–39. After conferring with Drs. Stone and Adler, as well as with Gowie and HHC's legal staff, Dr. Jones decided on or about January 4 that Dr. Altman would not be reinstated as Chief of Medicine, but would be allowed to return to Metropolitan as an attending physician. *See* Jones Dep. at 114–40. Given a choice on January 4 of resigning immediately as Chief of Medicine or being dismissed from that position by HHC, Dr. Altman said that he would resign rather than be terminated. Compl. ¶ 25. He attempted to revoke his resignation shortly afterward, but the defendants replied that it had already been accepted by HHC. *Id.* ¶ 26; Pl.'s Ex. 10. When plaintiff's subsequent proposal that he return as Chief with one or more specified individuals serving as his "professional monitor," *see* Pl.'s Ex. 29, was met with indifference, he sought, without success, an injunction from this court ordering that the defendants restore him to his old post. *Altman v. New York City Health & Hosps. Corp., et al.,* 93 Civ. 882, 1993 WL 106166 (S.D.N.Y. Apr. 2, 1993) (Griesa, J.), *aff'd,* 999 F.2d 537 (2d Cir.).[6]

---

**5.** The meaning of this term is discussed elsewhere in this opinion.

**6.** At various points during that litigation, the defendants stated that plaintiff would be allowed to serve as Chief of Rheumatology, a position

appointed not by HHC but by the College. However, the College appointed someone else to that position in February 1993, and Dr. Adler, the Dean of the College, subsequently refused to appoint Dr. Altman as Chief or Co-Chief for rea-

On June 29, 1993, plaintiff returned to Metropolitan as an attending physician. Altman Aff. ¶ 29. He filed the present action the following year.

## DISCUSSION

Plaintiff has brought claims against all defendants under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and under § 296 of New York's Executive Law. He claims that he was qualified to serve as Chief of Medicine at the time the defendants decided not to reinstate him, arguing that they discriminated against him on the basis of his alcoholism by (1) not reinstating him with the accommodation of a "professional monitor" and (2) instead demoting him to the position of attending physician. His claims are considered below.

### I. *The Americans with Disabilities Act*

#### A. *The Individual Defendants*

■ Although the Second Circuit has not ruled on the issue, the Seventh Circuit has concluded that individuals may not be held personally liable for damages under the Americans with Disabilities Act ("ADA" or "the Act"). *E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995). This court agrees with the Seventh Circuit's reasoning, which is drawn from several other recent decisions barring individual liability under other federal antidiscrimination statutes. *Smith v. Lomax,* 45 F.3d 402 (11th Cir.1995) (Title VII and ADEA); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507 (4th Cir.) (ADEA), *cert. denied,* —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994); *Grant v. Lone Star Co.,* 21 F.3d 649 (5th Cir.) (Title VII), *cert. denied,* —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583 (9th Cir.1993) (Title VII and ADEA), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). Accordingly, to the extent that plaintiff seeks to hold defendants Jones and Gowie personally liable on his ADA claim, summary judgment is granted in favor of those defendants on plaintiff's ADA claim.

sons then unknown to the individual defendants

#### B. *The Remaining Defendants*

■ To recover from the remaining defendants on his ADA claim, plaintiff must prove "(1) that he has a disability; (2) that he is otherwise qualified for the employment ... in question; and (3) that he was excluded from the employment ... due to discrimination solely on the basis of the disability." *Doe v. Univ. of Maryland Medical Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir.1995); *accord Mauro v. Borgess Medical Ctr.,* 886 F.Supp. 1349, 1352 (W.D.Mich.1995). Here, the parties do not dispute that Altman was a recovering alcoholic during the relevant time period, or that alcoholism is a "disability" within the meaning of the Act. *Schmidt v. Safeway Inc.,* 864 F.Supp. 991, 996 (D.Or. 1994); *see Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 517 (2d Cir.1991) (substance abuse is a "handicap" for purposes of Rehabilitation Act), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). The first element of plaintiff's claim thus is satisfied. As to the third element, plaintiff claims that, "solely on the basis" of his alcoholism, defendants decided to demote him to the position of attending physician, rather than allowing him to return as Chief with the accommodation of a "professional monitor"; and defendants readily concede that his alcoholism was the reason for their decision not to reinstate plaintiff as Chief. However, since the court agrees with the defendants that plaintiff was not qualified to resume his duties as Chief of Medicine at the time defendants decided not to reinstate him, his claim is dismissed.

#### 1. *Direct Threat*

■ A disabled individual is not "qualified" for a particular employment position if he poses a "direct threat" to the health or safety of others which cannot be eliminated by a reasonable accommodation. 42 U.S.C. § 12111(3); *Doe v. Univ. of Maryland Medical Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir. 1995); *Mauro v. Borgess Medical Ctr.,* 886 F.Supp. 1349, 1352 (W.D.Mich.1995); *see also Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 520–21 (2d Cir.1991), *cert. de-*

and unimportant to a decision on this motion.

*nied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). A "direct threat" is defined as a "significant risk of substantial harm." 29 C.F.R. § 1630.2(r).

■ At the outset, it is important to focus on the precise issue that confronted plaintiff's superiors at the time he sought reinstatement. Approximately three months earlier, plaintiff had been visibly drunk on the job and treating patients. While his actions in committing himself for treatment and participating in an ongoing recovery program gave hope for the future, his superiors had to weigh carefully the public safety concerns that an undetected relapse might entail. As the Second Circuit noted in *Teahan v. Metro North:*

> Inasmuch an [plaintiff's] responsibilities bear on public safety concerns, any conduct demonstrated to be a manifestation of his handicap that is likely to occur in the future and which may implicate those public safety concerns is a matter the district court should consider in determining whether he is "otherwise qualified."

951 F.2d at 521.

It is difficult to ignore the potential severity of the harm which Altman could have inflicted, as the hands-on supervisor of the largest department in Metropolitan, were he to have relapsed after being reinstated as Chief of Medicine. The Chief of Medicine's primary function is to oversee the care given to patients in between 140 and 160 beds, as well as up to 70 patients in the hospital's intensive care unit. Defs.' Ex. F; Altman Dep. at 159–61. Often the Department's patients suffer from life-threatening conditions, such as AIDS, tuberculosis, and cardiac, kidney and liver problems. Stone Dep. at 146–47. The Chief plays an integral role in the treatment of the Department's patients: he not only has his own, personal clinical practice, but also holds a daily "morning report" session at which all new cases and some follow-up cases in the Department are presented to him, and frequently makes rounds with residents and ward attending physicians. *See id.* at 149, 196–97. The Chief also must make final decisions as to the treatment of the Department's patients whenever there is uncertainty or disagreement among the physicians, interns and residents under his supervision. *See* Altman Dep. at 177–79. Although such decisions are theoretically reviewable by the Medical Director, Dr. Stone's lack of expertise in internal medicine[7] would prevent him from reevaluating by himself any decisions made by plaintiff. *Id.* at 179; *see* Stone Dep. 228–29. Emergencies which call for such decisions to be made can arise at any time, and the Chief always must be available to respond to such emergencies. *Id.; see* Altman Dep. at 149–52.

The harm that plaintiff might cause if, either during or immediately after a period of heavy drinking, he made a command decision as to the proper course of treatment of a patient by other staff members, need not be elaborated. Moreover, given the crucial role played by the Chief in the day-to-day functioning of the Department, even an abrupt self-recusal by the Chief when faced with pressing decisions, or his sudden absence from Metropolitan, might seriously interfere with the Department's provision of care to its patients; in other words, plaintiff would pose a risk to the patients who were his responsibility even if, during a relapse, he deliberately strove to *avoid* performing his duties when he was intoxicated or struggling with withdrawal symptoms.

Nor was the risk of a relapse an "insignificant" one at the time the individual defendants made their decision not to reinstate plaintiff. As Dr. Jones and Mr. Gowie knew, only three months had passed since plaintiff sought treatment; and as the individual defendants were also aware, plaintiff was a relapsed alcoholic in September 1992, not one whose drinking problem had first begun at that time. Although plaintiff claims that the defendants did not rely on any "objective, factual evidence" when making their determination as to the risk of a relapse, Pl.'s Br. at 21 (quoting the Interpretive Guidance to 29 C.F.R. § 1630.2(r)), the recency of plaintiff's recovery effort, and the fact that plaintiff had relapsed in the past, undoubtedly were relevant considerations, and were factors which

7. Dr. Stone is a pediatrician.

indicated that the risk of a relapse was still unacceptably high.

Plaintiff, however, protests that the defendants did not conduct a sufficiently thorough investigation and analysis of the likelihood of a relapse before reaching a decision: he notes, for example, that Dr. Jones did not personally confer with plaintiff's treating physicians or with any representative of the Committee for Physicians' Health, and did not review plaintiff's treatment records. *See* Pl.'s Br. at 20–23; Pl.'s Rule 3(g) Statement ¶¶ 103–14. Plaintiff's disparagement of the information-gathering process followed by Dr. Jones is, in the court's view, unjustified. Dr. Jones conferred with both Dr. Adler and Dr. Stone before making his decision, and Dr. Stone and Dr. Adler had communicated several times with the plaintiff, plaintiff's therapist and the Committee. From his prior experience as the Director of Psychiatry and then as the Medical Director of another HHC institution, *see* Pl.'s Ex. 25, Dr. Jones also had a detailed knowledge of the demands of the post which plaintiff sought to fill. This information certainly was sufficient to allow Dr. Jones to make an objective, reasonably accurate estimate of the risks of reappointing plaintiff to his old post; an exhaustive analysis of each and every facet of plaintiff's prior history, his treatment record, and his attitude toward his disability and toward his future as of January 1993 simply was not necessary.

In addition, it should be noted that the basic premise underlying plaintiff's argument—that a more thorough examination of the relevant evidence would or should have allayed Dr. Jones' fears—is a dubious one. A more thorough investigation might have revealed the fact that, during his September 1992 relapse, plaintiff gave advice to patients of the HIP Clinic, a clinic at which he worked at night and on weekends, while under the influence of alcohol. *See* Altman Dep. at 531–36. Similarly, an investigation might have revealed that, from the beginning of plaintiff's treatment in Smithers through his discharge, staff members there repeatedly noted plaintiff's denial or underestimation of the potency of his disease and of the problems it created in his life. *See* Defs.' Ex. P at 92, 99–120.[8] In other words, the kind of searching review of the record which plaintiff claims was necessary in the present case conceivably might have altered the defendants' estimate of the risk of a relapse, and of the possible severity of the consequences of a relapse; but there is no reason to believe that defendants' estimate either would, or should, have been more favorable to plaintiff as a result.

Although plaintiff's reinstatement as Chief of Medicine in January 1993 would have entailed a significant risk to the public's health and safety, the defendants would have been obligated to reinstate plaintiff so long as that risk could have been eliminated or reduced to "insignificant" proportions by means of a reasonable accommodation. *See* Interpretive Guidance to 29 C.F.R. § 1630.2(r). Plaintiff claims that the recovery program established by the Committee for Physicians' Health, in which he was enrolled at the time, would have sufficed: the program featured periodic urine testing,[9] and "professional monitoring" in the workplace. Defendants agree that some sort of monitoring in the workplace would have been necessary if plaintiff were to return to Metropolitan, but deny that plaintiff could have been reliably monitored, whether through the various "professional

8. Plaintiff's discharge report stated that he "remain[ed] in denial," and noted in the section headed "significant remaining problems" that plaintiff "underestimates disease"; the prognosis given was "guarded." Defs.' Ex. P at 92. These observations are consistent with many others previously made by the staff members who treated plaintiff. *See, e.g., id.* at 107 ("He minimizes the extent of his powerlessness over alcohol/drugs. He does not recognize the current unmanageability of his life or the consequences of his return to use."); *id.* at 112 ("He needs time to internalize what he is verbalizing."); *id.* at 114 ("His understanding of [his] disease and his powerlessness is superficial."); *id.* at 118 ("Does not see need to change behavior."); *id.* at 120 ("He has an intellectual understanding of his disease. He needs time to internalize his powerlessness and become willing to make behavior changes.").

9. Dr. Altman's urine testing was weekly. The record shows that anywhere between two days and over two weeks were required for the laboratory to receive a particular specimen, process it and issue a report. *See* Defs.' Ex. R.

monitoring" arrangements suggested by plaintiff or otherwise, had he been reinstated as Chief of Medicine.

Given the serious risk to patient safety posed by the possibility of a relapse by plaintiff, it could be reasonably argued that the hospital would have been justified in refusing to reinstate plaintiff even as an attending physician in January 1994. The fact that they were willing to attempt this accommodation for plaintiff does not draw in to question the reasonableness of their determination that a reinstatement to the position of Chief of Medicine would have involved unwarranted risks to the hospital's patients.

First, it must be noted that plaintiff's history suggests that he was able to consume substantial quantities of alcohol without his impaired condition being noticed by his professional colleagues. Thus, even reasonable monitoring could not insure that plaintiff would be performing his duties without his judgment being impaired by alcohol. To permit him to function as the Chief of Medicine and be responsible for the final decision as to the treatment of patients would clearly involve substantial risk to the hospital's patients.

Moreover, it would have been particularly difficult to monitor plaintiff's behavior and performance in the workplace had plaintiff been restored to his old post as Chief of Medicine. As Chief, he himself would have controlled many of the formal systems used to assess the performance of the Department's staff, such as the departmental "quality assurance" program, the process of periodic evaluations of each staff member's performance, and the Department's peer review system. *See* Defs.' Ex. F; Stone Dep. at 120, 160. In addition, the people perhaps best equipped to monitor plaintiff's performance and behavior in a less formal way—the departmental staff members with whom he interacted on a day-to-day basis while performing his clinical and administrative duties—would have been placed in the awkward position of having to judge the judgment, and if necessary, having to disobey the instructions, of their supervisor. They also would have had to face the unsettling truth that, if they reported another relapse to plaintiff's superiors, they would effectively have brought about the end of plaintiff's professional career.[10]

Plaintiff, however, praises the virtues of the "professional monitoring" program proposed by the Committee on Physicians' Health, and suggests that any of four individuals could have served as his "professional monitor" were he reinstated as Chief: Dr. Stone; Dr. Cohen; Dr. Fuleihan; or a monitor chosen by defendants whose identity would have remained unknown to him. Since plaintiff never understood just what his "professional monitor" was supposed to do, Altman Dep. at 683–717, and the briefs which he has submitted provide few specifics about the "professional monitor's" role, evaluating plaintiff's four proposals is a less than straightforward task. "Professional monitoring" is, however, described with reasonable precision in the deposition testimony of Dr. Stone: he explained that, were plaintiff reinstated as Chief, the Committee on Physician's Health would have expected Dr. Stone, as plaintiff's monitor, to use ordinary interactions in the workplace as opportunities for observing plaintiff's sobriety and behavior. Stone Dep. at 35–39. Given Dr. Stone's lack of any expertise internal medicine, he would have monitored Dr. Stone's clinical functions in, at most, "a broad sense," *id.* at 40; he would have felt "uncomfortable" doing anything more, *id.* at 39. His identity as plaintiff's monitor would have been revealed to plaintiff, but not to the staff. *Id.* at 42–43.

The arrangement described by Dr. Stone would have done little, if anything, to solve the problem of detecting a relapse—and of

---

10. It should be noted that, in the 1980's and in 1992, only one colleague of Dr. Altman ever came forward to Dr. Altman's supervisors and indicated that plaintiff had a drinking problem; and none of plaintiff's colleagues or subordinates approached him with questions or concerns. In both the 1980's and 1992, it was only after plaintiff's supervisors themselves detected signs of his problem, and confronted plaintiff, that he received treatment. These facts suggest either that virtually no one, other than plaintiff's supervisors, noticed any signs of plaintiff's alcohol abuse; or that other people noticed, but did not take any action. Neither conclusion is particularly reassuring.

minimizing the harm that might result—in the event plaintiff were reinstated. Although Dr. Stone would have relied on routine interactions in the workplace as chances to monitor plaintiff's behavior, plaintiff's duties as Chief of Service extended beyond the confines of the workplace and the ordinary workday; and the decisions which plaintiff would have had to make at odd hours, without warning, almost by definition would have involved crises in the Department. Moreover, even during normal hours in the workplace, Dr. Stone neither would have, nor could have, overseen plaintiff's performance of his clinical duties in any meaningful way; and it is precisely while carrying out those duties—not while talking with Dr. Stone about administrative matters in his office or at a meeting—that plaintiff could have done harm the most easily, and also could have done the greatest harm, were he to relapse after being reinstated.

Plaintiff responds that there was no real need for his monitor to be able to evaluate plaintiff's clinical judgment or performance of his clinical duties as Chief. He argues that "it is well established that alcoholics, like Dr. Altman, *who are in full compliance with their treatment and recovery program* are not impaired individuals. Thus there is no objective medical reason to question their judgment or ability to function effectively." Pl.'s Reply Br. at 6 (emphasis added); *see* Pl.'s Br. at 19. But these truisms miss the point: if Dr. Altman remained sober, there might be no reason to question his ability to make decisions; but if Dr. Altman relapsed, there would be every reason to question his ability to perform his clinical duties safely and effectively. It is to detect a relapse and to avoid the harm that might result—not merely to shepherd plaintiff through an uneventful recovery—that a monitor would be necessary.

The individuals whom plaintiff has suggested as alternatives to Dr. Stone seem no better suited to have played the role of "mon-itor" than he would have been. Like Dr. Stone, Dr. Cohen does not specialize in internal medicine, *see* Jones Dep. at 145–46; and since Dr. Stone and Daniel Michels (the representative of the Committee who oversaw plaintiff's recovery program) themselves considered Dr. Cohen as a possible work monitor—but chose Dr. Stone instead—it is hard to see why plaintiff believes that adding Dr. Cohen's name to Dr. Stone's on the list of potential "monitors" helps his case. *See* Stone Dep. at 41–42.[11]

It is true that Dr. Fuleihan specializes in internal medicine, unlike either Dr. Stone or Dr. Cohen. However, Dr. Fuleihan would have been forced to monitor plaintiff while being supervised by him—a situation which caused "concern" when Dr. Stone and Michels considered Dr. Fuleihan as a possible monitor in December 1992. Stone Dep. at 41–42, 243–44. Plaintiff denies that such an arrangement would have proved to be an unworkable one, but it is hard to see how difficult moments could have been avoided, and plaintiff has made no real attempt to address these difficulties: he has not, for example, suggested how disagreements between Dr. Fuleihan and himself over his sobriety or his conduct—or, for that matter, over the propriety of Dr. Fuleihan's monitoring efforts or other aspects of Dr. Fuleihan's performance—would have been handled if he had remained Dr. Fuleihan's supervisor. Plaintiff's next suggestion, that someone other than the Chief of Medicine could have supervised Dr. Fuleihan if he were plaintiff's monitor, also has little practical value: it would have been extremely difficult for someone other than the Chief to have control over the various details of Dr. Fuleihan's full-time work in the Department; and the Chief's authority would have been seriously undermined if the staff learned that another member of the Department, who was not accountable to him, had the special duty of evaluating his behavior and his performance. *See* Jones Dep. at 147–51.[12]

11. It should also be noted that, even assuming Dr. Cohen was familiar with internal medicine and saw Dr. Altman as or more regularly than Dr. Stone, it would have been "absolutely" not appropriate, in Dr. Stone's words, for a nonmember of the Department of Medicine to exer-cise clinical oversight over the Department and its Chief. Stone Dep. at 249–50.

12. Especially given the propensity for gossip at Metropolitan, *see* Adler Dep. at 175; *see also* Jones Dep. at 151, it seems rather likely that

Plaintiff's final proposal—a monitor whose identity would have remained unknown to him, and thus need not be revealed to the defendants or the court at this juncture—is a *deus ex machina*, not a viable alternative to the three possible monitors discussed above. Plaintiff has not suggested how someone who would regularly and closely observe plaintiff's performance and behavior, and when need be would question or challenge plaintiff about his conduct, could be expected to keep his identity as plaintiff's monitor secret; nor has he explained who such a monitor would be, or how the monitor's anonymity would help matters. *See* Altman Dep. at 711–13.

In short, the court concludes that plaintiff would have posed a "significant risk of substantial harm" to Metropolitan's patients if defendants had restored him to his old post, and that none of the accommodations suggested by plaintiff would have eliminated that risk or reduced it to a manageable level; nor, in view of the considerable difficulties involved in monitoring a Chief of Service's performance, can the defendants be faulted for failing to devise some other scheme to safeguard patients against the possible harmful consequences of a relapse. Accordingly, the court concludes that defendants were not required to reinstate plaintiff as Chief of Medicine in January of 1993.

### 2. *Additional Considerations*

■ Although the discussion in the previous section is phrased in terms of a "direct threat," it should be emphasized that even if the court ignored the risk of harm to patients that would have resulted from plaintiff's reinstatement as Chief of Medicine, the court would nonetheless conclude that HHC and Metropolitan were justified in not reinstating plaintiff. The Chief of Medicine's decisions as to the proper treatment of patients have the most immediate impact on patients' welfare, and it is because the Chief must make such decisions that the "direct threat" analysis is applicable in this case. But it is also the Chief's job to make many other hard decisions which ultimately affect the quality

of the care that patients receive: his responsibilities for assignment of personnel within the different areas of the Department, for evaluation of staff, and for overseeing the departmental "quality control" program, are just a few of the duties which require him to make such decisions. In making these choices, the Chief also plays a vital role in shaping the professional lives of the 150 physicians, staff members and residents in the Department.

Due to the nature of the Chief's responsibilities, if plaintiff had relapsed after being reinstated, he would have been in a position to make decisions having a significant impact on the well-being of others while his judgment was impaired; and that would have been a recipe for disaster. It is true that a monitor might, after a time, have detected a relapse and, after more time, have procured plaintiff's removal; but whatever mistakes plaintiff had made in the interim—mishandling of departmental budget emergencies, misassignment of staff, mismanagement of disciplinary problems or feuds among staff members, misinstruction of medical students (and, of course, mistreatment of patients)— would have been difficult, or perhaps impossible, for the hospital to undo. Moreover, it cannot be said that, three months after plaintiff had been found on the job while intoxicated, and two months after he left Smithers with that institution's final assessment of him being that he "remained in denial" and "underestimated his disease," *see supra* note 8, the possibility of a relapse was a speculative or remote one.

■ Under these circumstances, it is impossible to avoid the conclusion that plaintiff was unqualified to serve as Chief of Medicine. The policy behind the ADA is to require that an employer make "reasonable accommodations" for a disabled individual, not to force an employer to make accommodations whose costs to the employer or to the public are out of all proportion to the benefit to the individual. *Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 542–43 (7th Cir.1995). In light of that policy,

such an unusual alteration in the Department's administrative structure would have become widely known.

it is the court's view that HHC and Metropolitan were under no legal obligation to stake the welfare of the patients and staff of the Department of Medicine on plaintiff's uncertain recovery prospects. Rather, defendants provided a sensible and generous accommodation for plaintiff when they offered to allow plaintiff to return as an attending physician, a position in which patients would be adequately safeguarded by the Department's formal and informal mechanisms for evaluation of plaintiff's performance—and, of course, by the Chief of Medicine's supervision of plaintiff. *See Guice–Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir.1992) (offer of reassignment to alternate position, without significant loss of pay and benefits, is "a 'reasonable accommodation' virtually as a matter of law"); *see also Vande Zande*, 44 F.3d at 545.

### 3. *"Administrative and Other Realities"*

■ Plaintiff argues that defendants' apprehensions concerning a relapse, and the difficulties of monitoring plaintiff in the workplace, were not the real reasons for defendants' decision not to reinstate him as Chief of Medicine. Rather, he claims that these were "pretexts" devised by the defendants to explain their decision to remove him from a highly visible position in the hospital and the community, and thus to avoid having to confront the anti-alcoholic prejudices of staff and community members. Pl.'s Br. at 19–20, 23–25; Pl.'s Reply Br. at 9–11. In support of this argument, plaintiff notes that (1) despite defendants' asserted concern for patients' health and welfare, plaintiff returned to Metropolitan as an attending physician on June 29, 1993, with Dr. Stone as his "professional monitor", and was allowed to undertake "ward attending" duty; and (2) Dr. Jones took into account "administrative and other realities," Pl.'s Br. at 19 (quoting Stone Dep. at 26), including the community's negative reaction to the events of September 30, 1992, when he decided not to reinstate plaintiff as Chief of Medicine.

Since defendants readily admit that plaintiff's disability was the reason for their decision not to reinstate him as Chief, plaintiff's emphasis on the "pretext" analysis applicable

elsewhere in discrimination law is somewhat misplaced. *See Teahan v. Metro–North Commuter R.R. Co.*, 951 F.2d 511, 514–15 (2d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). More importantly, however, plaintiff's argument is wholly unconvincing. As to plaintiff's first point, it is true that the risk of a relapse still existed at the end of June 1993, when plaintiff returned to Metropolitan; but by that time, plaintiff had been in full compliance with his treatment and recovery program for nine months. Moreover, as noted above, *see supra* page 26, the Chief of Medicine's supervision of plaintiff, and the departmental mechanisms for evaluating plaintiff's performance, served to protect patients against the possible consequences of a relapse.

Nor does plaintiff advance his case in any way by emphasizing Dr. Jones' and Mr. Gowie's concerns over patients' and staff members' negative reaction to the events of September 30, 1992. Plaintiff's conduct on that date which was grounds not only for his termination from Metropolitan, but for suspension or revocation of his medical license. Neither his coworkers, nor his patients and the patient community, nor his employer were obligated to condone his actions; to the contrary, the very statute on which plaintiff now relies "clearly contemplate[s] distinguishing the issue of misconduct from one's status as an alcoholic." *Maddox v. Univ. of Tennessee*, 62 F.3d 843, 847 (6th Cir.1995); *see* 42 U.S.C. § 12114(c)(1), (2), (4). If a university is justified in firing an alcoholic assistant football coach because it is "embarrassed" by the negative publicity resulting from an off-hours drunk driving incident, *see Maddox*, then surely defendants were justified in taking into consideration, along with the other issues discussed above, the negative reaction of some members of the staff and patient community to plaintiff's serious breach of his professional obligations.

### II. *New York Executive Law*

■ Section 296 of New York's Executive Law prohibits discrimination in employment on the basis of an individual's actual or perceived disability. Although alcoholism is a "disability" for purposes of § 296, *McEniry*

*v. Landi*, 84 N.Y.2d 554, 620 N.Y.S.2d 328, 330, 644 N.E.2d 1019, 1021 (Ct.App.1994), plaintiff can recover from the defendants only if, despite his disability, he could have performed his duties as Chief of Medicine "in a reasonable manner" had he been reinstated. N.Y.Exec.Law § 292(21). For the reasons given in Section I.B., the court concludes that, had plaintiff been restored to his old post, he could not have performed his duties in a manner which involved "reasonably" limited risk of harm to third parties. Accordingly, plaintiff's claim under § 296 is dismissed.

III. *Conclusion*

Summary judgment is granted in favor of defendants on all claims asserted by plaintiff, and this action is dismissed.

SO ORDERED.