**F.F., Plaintiff,**

v.

**CITY OF LAREDO, Transit Mgmt. Co. of Laredo, and Ricardo Pulido, Defendants.**

**Civil Action No. L–92–60.**

United States District Court, S.D. Texas, Laredo Division.

Dec. 13, 1995.

Rosa Elva Torres, Advocacy Inc., Pharr, TX, for F.F.

Lowell F. Denton, Denton & McKamie & Navarro, San Antonio, TX, Charles H. Sierra, San Antonio, TX, for City of Laredo.

Robert E. Bettac, Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, TX, Dewey Forrest Poteet, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, TX, for Transit Management Company, Rick Pulido.

## MEMORANDUM OPINION

KAZEN, District Judge.

Pending before the Court are Defendants' motions for summary judgment. Plaintiff, a bus driver, brought this action under § 504 of the Rehabilitation Act of 1973 against his employer, Transit Management of Laredo ("Transit"), Transit Management's general manager, Ricardo Pulido ("Pulido"), and the City of Laredo ("City"), alleging he was unlawfully discriminated against on the basis of his mental disability. Plaintiff also asserts pendent state-law claims for violations of the Texas Human Rights Commission Act (THRCA) and Article I, Section 19 of the Texas Constitution.

## BACKGROUND

### I. Procedural history

The Court referred these motions to Magistrate Judge Notzon for a report and recommendation. Judge Notzon filed a recommendation, on March 24, 1994, that Defendant City's motion be granted. (Docket n. 68). Plaintiff filed objections on April 7, 1994. In a second Magistrate's Recommendation, filed on July 7, 1995, Judge Notzon recommended that summary judgment be granted in favor of Transit and Pulido (Docket n. 70). Plaintiff filed objections to this recommendation on July 21, 1995. Defendants responded with a Motion to Strike and Response to Plaintiff's Objections to Magistrate's Recommendation on August 14, 1995. The Plaintiff then filed a response to the Defendants' response on August 21, 1995. In support of their motions, both parties relied upon various excerpts from the deposition testimony of Dr. Octavio Gutierrez. Also referenced were certain Department of Transportation ("D.O.T.") regulations and a physical examination of the Plaintiff performed by Dr. S.K. Lawson, a D.O.T. physician. On September

15, 1995, in order to clarify the record, the Court ordered the parties to supply the complete text of Dr. Gutierrez' deposition, the applicable D.O.T. regulations, and Dr. Lawson's report. Both parties complied with the Court's order. Having now reviewed the entire file, the Court concurs with the Magistrate's recommendation that summary judgment be granted in favor of all defendants.

## II. *Facts*

Plaintiff was employed by Transit as a full-time bus driver from April 1981 to August 30, 1990. Transit is a private corporation that operates the municipal transit system for the City of Laredo.

Plaintiff has a history of mental problems. In August of 1989, he was admitted to Charter Hospital of Laredo, where he received inpatient treatment for stress. (Docket n. 53, tab 2 at page 95). After being released from the hospital, he continued his convalescence at home until October of 1989, when his physician, Dr. Jose G. Garcia, allowed him to return to "light duty" at Transit. This release to work was not unconditional, however, as evidenced by an October 3, 1989 letter to Transit in which Dr. Garcia explained that:

> [Plaintiff's] mental disorder is unlikely to totally disappear. At best he will need psycho-chemotherapy for an indefinite period. [Plaintiff] can not [sic] return to his former duties because of the need to remain on heavy dose [sic] of antipsychotic medicine, and the same dose will render him a safety operational risk in his duty as a bus driver.

(Docket n. 53, tab 3 at exhibit A). Thus, Plaintiff was temporarily assigned the task of counting change collected from the fare boxes on the buses. (Docket n. 53, tab 2 at pages 101–02). Plaintiff received the same hourly wage he earned as a bus driver. (*Id.* at 102–03). On November 27, 1989, Plaintiff was given a medical release to return to his driving duties, and by the end of 1989, Plaintiff was again working as a full-time bus driver.

On August 30, 1990, Plaintiff was again hospitalized and treated for anxiety and depression. He testified that his anxiety arose from responsibilities as a bus driver. Specifically, he feared the possibility of an accident, or of running over a passenger boarding or exiting his bus. Mechanical problems such as air-conditioning failures also aggravated Plaintiff, as did passenger complaints. (Docket n. 53, tab 2 at pages 87–91).

Dr. Octavio Gutierrez, a licensed psychiatrist and member of the Charter Hospital staff, diagnosed Plaintiff with bi-polar mood disorder and prescribed the anti-psychotic drugs lithium and navane. (Docket n. 79 at pages 25–26). Dr. Gutierrez testified that persons taking either of these two drugs should not drive or operate heavy machinery. (*Id.* at 26–27). The doctor further testified that if Plaintiff failed to take the prescribed medication, the bi-polar disorder would possibly render Plaintiff incapable of safely operating a passenger bus due to "problems of judgment and changes of mood and reaction to stress." (*Id.* at 28). Later, Dr. Gutierrez stated that Plaintiff's greatest problems were related to stresses associated with dealing with passengers in traffic. (*Id.* at 29). Plaintiff was released from the hospital in early October, 1990.

On October 10, 1990, Dr. Gutierrez gave Plaintiff a letter for his employer stating:

> [Plaintiff] is currently under my medical care, following his recent hospital stay, and I feel he is unable to return to work at the present time. His treatment will continue with medication and follow-up psychotherapy. At this time I would estimate his continued disability to be approximately 1 month from today. Please contact me if any further information is required.

(Docket n. 53, tab 5 at exhibit 4). Plaintiff presented this letter to Michael Melaniphy, Transit Management's assistant general manager. Melaniphy offered Plaintiff light-duty employment as a revenue assistant, the same position Plaintiff held following his hospitalization the previous fall. Plaintiff refused this offer, instead demanding that, despite Dr. Gutierrez' orders, he be allowed to return to bus driving. (Docket n. 53, tab 2 at pages 128–31).

Plaintiff received a second letter from Dr. Gutierrez on October 31, 1990, permitting him to return to "light duty," but prohibiting

him from resuming his work as a bus driver. (Docket n. 53, tab 5 at exhibit 3). Plaintiff presented this letter to Melaniphy, informing him that he would accept any light-duty assignment position available. Melaniphy responded that the only light-duty positions available had been filled. (Docket 53, tab 2 at page 139).

Plaintiff then met with Dr. Gutierrez on December 4, 1990 and received a third letter, releasing Plaintiff to resume his "full-time, previous, job duties." (Docket n. 53, tab 5 at exhibit 2). The release was expressly contingent upon weekly psychiatric therapy sessions. Plaintiff hand-delivered the letter to Melaniphy and asked that he be restored his bus-driving job. Melaniphy denied this request, and apparently, Plaintiff did not renew his request for light-duty work. (Docket n. 53, tab 2 at pages 147–48). Because the letter was "rather vague," and did not describe the type of therapy prescribed or state whether the medications could affect Plaintiff's job performance, General Manager Pulido asked Melaniphy to contact Dr. Gutierrez to seek further clarification. (Docket n. 53, tab 4 at page 82). Pulido also asked Melaniphy to have Plaintiff examined by the company physician, Dr. Lawson, in order to determine whether Plaintiff still met the D.O.T.'s established physical standards.[1] (Docket n. 53, tab 4 at pages 78–82, 89).[2]

Shortly thereafter, Melaniphy met personally with Dr. Gutierrez. What exactly was said at this meeting is disputed. Transit Management claims that Dr. Gutierrez stated that Plaintiff was unfit to resume bus driving because he was taking lithium, a drug required to control the mood disorder. (Docket n. 53, tab 4 at pages 90–91). Dr. Gutierrez does not admit making those statements, but rather, referring to the meeting with Melaniphy, he stated: "I didn't felt [sic] I wanted to give any information regarding [Plaintiff] at that time and that I was just listening to what was being requested." (Docket n. 79 at page 33).

Plaintiff visited Dr. Gutierrez again on December 27, 1990 and received a clarification letter, which Dr. Gutierrez had promised Melaniphy during their meeting. The letter stated:

> At the present time [Plaintiff] appears to be showing no signs of depression; however, the possibility of relapse is always present and there is no guarantee that this cannot happen. This is especially possible if the work situation is demanding and requires dealing with many factors, i.e. dealing with passengers, driving decisions, etc. Due to these circumstances I have suggested to the patient that he might need to find a less stressful line of work.

(Docket n. 53, tab 5 at exhibit 1). Plaintiff hand-delivered this letter to Melaniphy, and asked to be returned to driving duties.

Because he felt that Dr. Gutierrez had still not answered whether Plaintiff was fit to resume driving duties, Pulido decided that if Dr. Lawson concluded that Plaintiff passed the mandatory D.O.T. physical, then Plaintiff could return to work. (Docket n. 53, tab 4 at page 102). Dr. Lawson examined Plaintiff on January 4, 1991 and determined that Plaintiff did not meet the physical standards required by the D.O.T. (Docket n. 78 at page 2).

## DISCUSSION

### Summary Judgment Standard

The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), but it need not "negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (citations omitted). If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. The nonmovant's burden is not satisfied by creating "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

---

**1.** Pulido testified at his deposition that, as a matter of course, Transit bus drivers are administered Department of Transportation physicals once a year. (Docket n. 53, tab 4 at page 79).

**2.** This physical was not to occur, however, until after Transit received the clarification concerning Plaintiff's condition from Dr. Gutierrez. (Docket n. 53, tab 4 at page 87).

475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), by making "conclusory allegations," *Lujan v. National Wildlife Fed'n.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990), or "unsubstantiated assertions," *Little,* 37 F.3d at 1075, or by proffering only a "scintilla" of evidence. *Id.*

In the March 24, 1994 recommendation (Docket n. 68), Judge Notzon advised that City's motion for summary judgment be granted as to all claims on the following grounds: (1) Plaintiff was not a City employee; (2) the City had no authority or control over Plaintiff's employer, Transit; and therefore, (3) City did not engage in impermissible discrimination against Plaintiff. The Court finds Judge Notzon's reasoning sound and adopts his recommendation. Alternatively, the Court notes that summary judgment is proper on the merits, even assuming that the City could be held liable for Transit's conduct.

I. *Section 504 of the Rehabilitation Act of 1973*

 Plaintiff contends that Transit Management's refusal to allow him to return to work as a bus driver constituted unlawful discrimination under § 504 of the Rehabilitation Act. To qualify for relief under the Act, Plaintiff must establish the following: (1) that he was an "individual with handicaps;" [3] (2) that he was "otherwise qualified;" (3) that he worked for a "program or activity" that received federal financial assistance; (4) and that he was adversely treated solely because of his disability. *Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

Defendants move for summary judgment on the ground that Plaintiff is neither an "individual with handicaps" nor "otherwise qualified" for the bus driver position. Magistrate Judge Notzon recommended that summary judgment be granted on the ground that Plaintiff was not otherwise qualified, thus obviating the need to decide whether Plaintiff had a disability. With regard to the threshold question of whether Plaintiff could perform the essential functions of the job,

the Magistrate's reasoning was sound and the Court therefore adopts the conclusions set out in the Magistrate's Recommendation of July 7, 1995. While the Court agrees with Judge Notzon's conclusions, it notes that Judge Notzon did not analyze the second prong of the "otherwise qualified" inquiry: reasonable accommodation. *Chandler,* 2 F.3d at 1393–94. Nor did Judge Notzon have the benefit of the entire text of Dr. Gutierrez' deposition, the report of Dr. Lawson, and the relevant D.O.T. regulations. The Court will therefore address the issue of reasonable accommodation and the impact of the supplementary materials.

A. *Essential Functions*

 To determine whether Plaintiff was "otherwise qualified" to be a bus driver, the Court must conduct a two-part inquiry: (1) determine whether Plaintiff could perform the "essential functions" of his job; and (2) if Plaintiff could not perform those essential functions, determine if any reasonable accommodation by Defendants would enable Plaintiff to perform those functions. *Chiari v. City of League City,* 920 F.2d 311, 315 (5th Cir.1991). When applying § 504 of the Rehabilitation Act of 1973, courts have unanimously held that an individual with a disability "cannot perform the essential functions of a job if his handicap **poses a significant safety risk to those around him.**" *Id.* at 316 (emphasis added); *cf. Daugherty v. City of El Paso,* 56 F.3d 695, 696 (5th Cir.1995) (discussing, in an Americans with Disabilities Act ("ADA") action, the requirement that an individual "shall not pose a direct threat to the health or safety of other individuals in the workplace") (citation omitted). In the present case, Plaintiff was not capable of performing the essential functions of a bus driver once he was diagnosed with the bipolar mental disorder. The relevant D.O.T. regulations clearly state that a person should not drive a motor vehicle unless he is physically qualified to do so. 49 C.F.R. § 391.41(a). The regulations further provide that a person is not physically qualified if that person has a "mental, nervous, organic,

---

**3.** The Rehabilitation Act previously referred to

individuals with a "disability" as "handicapped."

or functional disease or psychiatric disorder likely to interfere with his ability to control a motor vehicle safely." *Id.* at § 391.41(b)(9). It is undisputed that Plaintiff suffers from a psychiatric disorder, bi-polar mood disorder. The question then is whether that disorder was likely to interfere with Plaintiff's ability to safely operate a passenger bus. Plaintiff argues that when properly treated, his disorder would not have prevented him from driving the bus safely.

From the summary judgment evidence before the Court, it is evident that Plaintiff, because of his condition, posed a significant safety risk to the public regardless of whether he was taking his prescribed medication. Plaintiff's first psychiatrist, Dr. Garcia, explained that Plaintiff's condition would require a "heavy dose of antipsychotic medicine, and **the same dose will render him a safety operational risk in his duty as a bus driver."** (Docket n. 53, tab 3 at exhibit A) (emphasis added).

Dr. Gutierrez testified that without medication, the Plaintiff could possibly be rendered incapable of driving a passenger bus because of "problems of judgment and changes of mood and reaction to stress." (Docket n. 79 at page 28). The doctor further testified that, even with treatment, Plaintiff's condition did not improve to a level where Plaintiff could resume his bus driving duties. (*Id.* at 54).[4] In fact, Dr. Gutierrez himself felt "very scared knowing [plaintiff] was driving an eighteen wheeler at eighty-five miles per hour." (*Id.*). This is not to say, however, that Plaintiff even followed Dr. Gutierrez' prescribed treatment. Apparently, Plaintiff did not return for weekly therapy as directed nor did he continue taking his medication. (Docket n. 53, tab 5 at pages 34–35). A third physician, Dr. Lawson, also found Plaintiff unsuitable to drive the passenger bus, as evidenced by the doctor's rejection of D.O.T. certification for the plaintiff. (Docket n. 78 at page 2). In light of the

direct threat against public safety posed by his condition, Plaintiff could not perform the "essential functions" of his job as a passenger bus driver.

### B. *Reasonable Accommodation*

■ The second prong of the "otherwise qualified" inquiry is whether any reasonable accommodation by Defendants would have enabled Plaintiff to perform the essential functions of a bus driver. If a reasonable accommodation would not have eliminated the significant safety risk, Plaintiff was not "otherwise qualified" for the position. *Chiari*, 920 F.2d at 317 ("a significant risk of personal injury can disqualify a handicapped individual from a job if the employer cannot eliminate the risk"). Because Plaintiff's operation of a passenger bus would have threatened public safety whether or not he was taking his prescribed medication, Defendants correctly argue that the risk could not be eliminated—at least in regard to the position of bus driver. In fact, had Plaintiff been allowed to continue operating the passenger bus, the potential liability to the Defendants in the case of an on-the-job episode of Plaintiff's disorder would be tremendous. As the Fifth Circuit most recently reiterated: "Woe unto the employer who put such an employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident." *Daugherty*, 56 F.3d at 698 (citation omitted).

■ Plaintiff argues alternatively that Defendants should have accommodated Plaintiff by reassigning him to a different, less stressful position. Although the record shows, and Plaintiff concedes, that Defendants offered other positions, the Court recognizes that "reasonable accommodation" does not require reassignment to another position nor does it require that the Defendants find or create a new job for Plaintiff. *Daugherty*, 56 F.3d at 698–700; *Chiari*, 920 F.2d at 318. In

---

**4.** During Dr. Gutierrez' deposition, the following exchange took place:

Q. At any point in your treatment of [Plaintiff] were you prepared to release him to drive a bus in the city of Laredo?

A. No, unless he had showed such improvement that he was—you know, he was showing

judgment, mood changes and such improvement that he was able to do that.

Q. Okay. And during the process of your active treatment of [Plaintiff] that never happened?

A. Right.

(Docket n. 79 at page 54).

this case, however, in October 1989, Plaintiff was temporarily assigned the task of counting change collected from the fare boxes on the buses. (Docket n. 53, tab 2 at pages 100–02). In this position, Plaintiff received the same hourly wage as a bus driver. (*Id.* at 103). In early October 1990, after another period of hospitalization, Plaintiff was again offered the position of a revenue assistant, an offer which the Plaintiff refused because of his insistence that he be allowed to return to bus driving duties. (*Id.* at 128–31). In early November, 1990, Plaintiff asked Transit for any available light-duty assignments but learned that the positions had been filled. Finally, in December of 1990, Plaintiff again requested to be reinstated as a bus driver, but apparently did not renew his request for light-duty work. (*Id.* at 147–48).

■■■ While the Defendants were not obligated to find or create a new job for Plaintiff, the record evinces their efforts to find Plaintiff alternative employment. There is no evidence that Defendants treated Plaintiff any worse than they treated other displaced workers nor that the failure to procure light-duty assignments was the result of discrimination based on Plaintiff's mental condition. Section 504 of the Rehabilitation Act does not require "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less." *Daugherty*, 56 F.3d at 700 (discussing reasonable accommodation under the ADA). There was no evidence of such discrimination and the summary judgment evidence shows that he was not "otherwise qualified" as required by § 504 of the Rehabilitation Act. The Defendants have thus demonstrated the "absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553, and summary judgment is proper.

II. *Texas Commission on Human Rights Act*

■■■ Summary judgment is likewise proper as to Plaintiff's claims under the Texas Commission on Human Rights Act. TEX.

LAB.CODE ANN. § 21.051 (Vernon 1995). That act requires that the Plaintiff prove he was discharged because of disability, *i.e.*, on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform the job. This definition is analogous to the "otherwise qualified" requirement under § 504 of the Rehabilitation Act. The Defendants demonstrated that Plaintiff's condition did impair his ability to reasonably perform the job of driving a bus and therefore Plaintiff's claim fails. *Chiari*, 920 F.2d at 319.

III. *Article I, Section 19, of the Texas Constitution*

■■■ The Court also GRANTS non-city Defendants' summary judgment motions as to Plaintiff's claim under Article I, § 19 of the Texas Constitution for the reasons set forth in the Magistrate's Recommendation of July 7, 1995. (Docket n. 70 at pages 7–8). The City's summary judgment motion on this claim is likewise GRANTED on the grounds included in the March 24, 1994 Magistrate's Recommendation. (Docket n. 68). Moreover, even if Plaintiff could show state action, Texas does not appear to recognize violations of its constitution as an independent tort. *Eugene v. Alief Indep. School Dist.*, 65 F.3d 1299, 1306 (5th Cir.1995); *see also Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582, 584 n. 1 (Tex.App.—Houston [14th Dist.] 1991, no writ). In any event, Defendants' conduct in preventing Plaintiff from operating a bus on the basis of the significant safety risk posed by his mental condition would not seem to constitute a constitutional violation.

### *CONCLUSION*

The Court GRANTS the following motions:

(1) Defendant City's motion for summary judgment on all claims. (Docket n. 52).

(2) Defendants Transit and Pulido's motion for summary judgment on all claims. (Docket n. 53).