**Timothy ADAMS, Plaintiff**

v.

**ROCHESTER GENERAL HOSPITAL, Defendant.**

**No. 95–CV–6587Fe.**

United States District Court, W.D. New York.

Aug. 15, 1997.

Jeffrey Wicks, Bansbach, Zoghlin & Asandrov, Rochester, NY, for Plaintiff.

Paul J. Yesawich, III, Harris, Beach & Wilcox, Rochester, NY, for Defendant.

## PROCEDURAL BACKGROUND

FELDMAN, United States Magistrate Judge.

Plaintiff, Timothy Adams, ("Adams") commenced this action pursuant to the American

with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA") against the defendant Rochester General Hospital ("RGH"). In his complaint, Adams alleges that on April 21, 1994 RGH violated the ADA (and the corollary provisions found in § 296 of New York's Human Rights Law) by terminating his employment with the hospital.

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this matter, including dispositive motions and trial, by this Court. Pending before the Court is RGH's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket # 7) For the reasons set forth below, RGH's motion is granted.

### RELEVANT FACTS

The relevant facts, viewed in the light most favorable to plaintiff, are as follows. Timothy Adams began working for RGH on June 22, 1992 as a Bio-medical Engineering Technician ("BIOTEC"). BIOTEC employees are responsible for inspecting, maintaining, calibrating, and repairing medical equipment used in the hospital. The position requires the employee to demonstrate considerable accuracy and responsibility as job performance errors could affect patient health and safety. Adams' immediate supervisor was Anthony Marchese (Marchese), the manager of RGH's bio-medical engineering department. In the fall of 1992, Marchese prepared Adams' first job performance evaluation. The evaluation reflected that Adams either met the standards imposed by the department or was unable to be evaluated in certain areas because he had not yet been provided training.

In September or October 1992, Marchese became aware, through discussions in the shop and observing "heated phone conversations," that Adams was having marital difficulties. On December 15, 1992, Adams failed to appear for work. A co-worker and friend of Adams, Jerome Patterson, told Marchese that Adams was having marital problems and was "distraught." Concerned, Marchese spoke with Adams by telephone and told him to take a couple of days off.

On December 17, 1992 Adams appeared for work. Marchese described Adams as looking "haggard in appearance" and in a "very emotional state." Marchese met with Adams privately to discuss "what was going on." During the ensuing conversation, Adams indicated that he wanted to kill his wife. Marchese asked Adams to accompany him to speak with Brenda Evans, RGH's manager of employee health. Adams and Marchese met with Evans. During this meeting, Adams indicated he was contemplating suicide. Evans suggested that Adams meet with someone in the hospital's mental health facility and both Evans and Marchese escorted Adams to the mental health department. Adams was thereafter admitted to RGH's mental health department. He remained hospitalized until January 4, 1993.

On January 5, 1993 Adams returned to work with no restrictions. During the subsequent twelve months, Adams never indicated that he was suffering from mental illness, never presented a doctor's note containing any medical diagnosis of mental illness, and never requested RGH accommodate a disability he was experiencing. In November 1993, Marchese prepared a job performance appraisal for Adams. The appraisal indicated Adams was satisfactorily performing his job duties. Adams signed the appraisal without comment on January 7, 1994.

On January 20, 1994 Adams went to the hospital's emergency department complaining of "depression, nervousness and tension." Adams was not admitted to the hospital and there is no evidence in the record to indicate he ever told anyone at work, including Marchese, about the emergency department visit.

On January 27, 1994, Adams was verbally reprimanded by Marchese for failing to properly repair a "thermia unit." A week later, on February 3, 1994, Marchese discovered that Adams had failed to properly inspect and repair another "thermia unit." The following day Marchese and Virgil Ansley, the shop foreman, met with Adams. Marchese provided Adams with a written "Record of Warning." The written warning described both the January 27 and February 3 incidents and informed Adams that if he failed to

follow "correct [inspection] procedures ... termination will be considered as this could directly affect patient safety." Adams accepted and signed the "Record of Warning" indicating that the statements made in it were true.

On April 19, 1994 Marchese was informed by another RGH employee that a syringe pump used for feeding and giving medication to infants was not operating properly after having been recently repaired. Marchese investigated and determined that Adams last repaired the pump. According to Marchese, departmental policy required the pump to be repaired by installing a new clamp. While Adams had ordered a new clamp, he did not wait for the part to arrive and, instead, installed an older obsolete clamp on the pump and then placed the pump back into service. Based on this investigation, Marchese issued a second written "Record of Warning" to Adams. Marchese and Ansley again met with Adams to discuss the second warning. At the conclusion of the meeting, Adams signed the warning and was informed that he was being suspended for one day (April 20, 1994).

After issuing the second written warning, Marchese met with RGH Vice President Wayne Searles and discussed Adams' job performance problems. According to Marchese, the continued employment of Adams created an unacceptable risk to patient health and safety. On April 21, 1994, when Adams returned to work after his suspension, Marchese and Searles met with Adams and informed him that his employment with RGH was being terminated.

At the time he began working for RGH, Adams was provided a copy of the hospital's "Employee Guide to Personnel Policy" (Adams deposition at page 53). The Guide provided that an employee's "failure to follow departmental policies and procedures" could result in discharge from employment. (*See* Exhibit "7" annexed to Docket # 9). During his deposition Adams admitted that he "failed to follow department policies and procedures" with respect to his repair of the thermia units and conceded that "maybe" he had failed to follow department policies and procedures in repairing the syringe pump.

(Adams deposition at page 63.) As to any mental disability which would have prevented Adams from competently performing his job, Adams gave the following sworn deposition testimony:

Q: Mr. Adams, prior to your termination meeting with Mr. Marchese and Mr. Searles, before that, had you ever told anyone at Rochester General that the mental stress you were suffering from prevented you from doing your job in any way?

A: No

Q: Had you ever requested that any physician, psychologist, psychiatrist communicate with any of your supervisors at Rochester General prior to your termination and explain to them why you couldn't do your job because of mental stress that you were suffering?

A: No.

Q: At the time you received—[the first written Record of Warning]—was there any reason that you know of that you were not able to perform your job at that time.

A: Not at that time.

Q: And similarly, with respect to [second written Record of Warning] for the syringe pump, at that time, was there any reason to your knowledge, that you were incapable of doing your job at that time?

A: Not at that time.

(Adams' deposition at pages 65–66.) As to the reason why he was terminated, Adams testified that he was related by marriage to Marchese and that he "knew" co-workers were jealous of this familial relationship. As a result, Adams felt that Marchese "didn't want anything to do with me" and this contributed to his termination. (Adams' deposition at pages 104–105.)

On November 21, 1995 Adams filed the instant lawsuit alleging that RGH discriminated against him by terminating his employment because of a disability. Adams' complaint identifies his alleged disability as "mental stress."

## DISCUSSION

***Summary Judgment Legal Standard:*** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be granted if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995). The burden of showing the absence of any issue of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, "when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (internal quotations omitted).

While the Second Circuit has cautioned that careful consideration should be given before summary judgment is granted to an employer in a discrimination case, *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994), "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material facts." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 40 (2d Cir.1994). *See also Glidden v. County of Monroe*, 950 F.Supp. 73, 75 (W.D.N.Y.1997) (summary judgment granted in ADA action; principles of summary judgment "apply no less to this action simply because it is an employment discrimination case"). To defeat a well documented motion for summary judgment, a plaintiff must come forward with evidence sufficient to support a jury verdict in his favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (summary judgment motion in discrimination case will not be defeated on the basis of conjecture, surmise or conclusory state-

ments and contentions); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (plaintiff in discrimination case could not defeat summary judgment by simply offering conclusory allegations of discrimination, the record must contain "concrete particulars" to substantiate the claim).

***Adams' ADA Claim:*** The Americans with Disabilities Act prohibits an employer from discriminating against an otherwise qualified individual with a disability because of the disability of such individual. 42 U.S.C. § 12112(a). Discrimination in "the hiring, advancement, or discharge" of employees is specifically prohibited by the ADA. *Id.* In order to establish a *prima facie* case under the ADA, Adams must show that: (1) he is "disabled" within the meaning of the ADA; (2) he is "otherwise qualified" to perform his job; and (3) he was terminated because of his disability. *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996); *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 135 (2d Cir.1995). At the summary judgment stage, Adams' burden is not one of demonstrating discrimination by a "preponderance of the evidence." Rather, Adams need only "establish a prima facie case by producing evidence sufficient to support a reasonable inference of discrimination." *Kotlowski v. Eastman Kodak*, 922 F.Supp. 790, 796 (W.D.N.Y.1996).

After carefully examining the record, Adams is clearly unable to demonstrate a *prima facie* case that his termination from employment violated the ADA.

■■■ **1. *Adams Was Not "Disabled" Under the ADA:*** The ADA protects "disabled" individuals. An individual is "disabled" if he or she suffers from an "physical or mental impairment that substantially limits one or more of the major life activities of such individual." [1] 29 C.F.R. § 1630.2(g)(1). Major life activities include working. *Id.*

---

1. Pursuant to the ADA, plaintiff may also be deemed "disabled" if he has a record of an impairment or has been "regarded as having" an impairment. 42 U.S.C. § 12102(2)(A)–(C), 29 C.F.R. § 1630.2(i). Regardless of which definition Adams utilizes, he must show that his actual impairment substantially limits his ability to work or, if RGH "perceives" Adams to have an impairment, it must perceive that the impair-

ment is one which "substantially limits" his ability to work. *Glidden v. County of Monroe*, 950 F.Supp. 73 (W.D.N.Y.1997) (employer must perceive an impairment which substantially limits a major life activity); *Mundo v. Sanus Health Plan of Greater New York*, 966 F.Supp. 171, 173 (E.D.N.Y.1997) ("plaintiff must establish that the employer considered the impairment to foreclose not only a particular position, but the type of

Adams alleges that he suffers from a mental impairment which he describes in his complaint as "mental stress." During his deposition, Adams described his impairment as "depression" (Adams deposition at page 22), "manic-depression" (Adams deposition at 34–35) and "psychosis" (Adams deposition at 141). The record currently before the Court, however, is completely devoid of any expert opinion, medical affidavit, hospital or treating doctor's record indicating any medical diagnosis for Adams or, more importantly, that he was suffering from a specific "mental impairment" *at the time of his discharge from RGH. Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 884 (6th Cir.1996) (to establish *prima facie* case, ADA plaintiff must establish that disability existed at the time of the discriminatory act).

■ Even if Adams was suffering from depression at the time of his discharge from RGH, that fact alone does not qualify him for relief under the ADA. While depression does qualify as a "mental impairment" under the ADA, *Fitzgerald v. Alleghany Corp.,* 904 F.Supp. 223 (S.D.N.Y.1995); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442 (E.D.La.1994), a medical diagnosis of depression is not the *sine qua non* of being disabled within the meaning of the ADA. A "mental impairment" does not rise to the level of a "disability" unless such impairment "substantially limits" a major life activity. *Kotlowski v. Eastman Kodak Co.* 922 F.Supp. at 797 (ADA plaintiff may not defeat summary judgment motion by simply invoking diagnosis of depression; must also demonstrate that impairment substantially limited ability to work); *Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1132 (11th Cir. 1996) ( "in order to constitute a disability under the ADA, the impairment ... must substantially limit a major life activity").

■ In the instant case, Adams claims that his depression substantially limited his ability to work. To succeed on his ADA claim, Adams must be able to show that his depression substantially limited his ability to

work at not only his existing job, but any job. "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994) ("person found unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting such person's major life activity of working"); *Kirkendall v. U.P.S.. Inc.,* 964 F.Supp. 106, 110 (W.D.N.Y.1997) (if major life activity is "working," impairment must limit employment generally.)

Based on the foregoing legal guideposts and by his own admissions, Adams is not disabled within the meaning of the ADA. At his deposition, Adams did not claim that his depression substantially limited his ability to do his job. Indeed, he conceded that at the time of his discharge from RGH there was no reason why he was not capable of performing his job. (Adams deposition at pages 65–66). Adams has failed to provide any medical reports, opinions or documents which even suggest, let alone confirm that his ability to work or function in any other capacity was substantially limited by his depression. *Compare Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1133–1134 (11th Cir.1996) (summary judgment on ADA claim reversed where plaintiff's personal affidavit and medical expert affidavit created a genuine issue of fact whether plaintiff's impairment substantially limited a major life activity). Adams concedes that at no time prior to his termination did he ever tell anyone at RGH that "mental stress" prevented him from performing his job, nor did he ask any doctor or mental health professional to notify RGH of his condition or that his depression affected his ability to do his job. Moreover, there is no evidence in the record to suggest that at the time of his discharge RGH regarded Adams as having any impairment which limited his ability to work. Indeed, in early 1994, Marchese provided Adams with a job performance evaluation reflecting satisfacto-

employment involved generally"). *See also Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989) (defendant police department never considered plaintiff "to be suffering from an impairment

which substantially limits a major life activity"). Adams failed to satisfy any of the ADA's three definitions of disability.

ry work performance for the previous twelve months.

Recognizing that Adams' own sworn testimony contradicts a finding of being disabled under the ADA, Adams' counsel opines that "when Adams suffers from depression, he often cannot remember events or incidents that occurred during that time period" and therefore his deposition testimony is entitled to "little weight." (Wicks Affirmation at page 6). In support of his opinion, counsel cites to several portions of his client's deposition testimony where, according to counsel, Adams displayed memory loss. (Wicks Affirmation at pages 6–7).

There are several problems with counsel's contentions. First, they are just that—*counsel's contentions.* While counsel is a respected member of the bar, he is not a psychiatrist or mental health professional. If Adams truly contends that his sworn deposition testimony as to an indispensable element of his claim should be disregarded by the Court, then Adams must provide medical evidence in the record for the Court to make such a finding. The unsupported opinion of counsel, without more, simply will not suffice.

Second, as plaintiff's counsel points out, there were questions posed to Adams during his deposition where he was unable to specifically recall events or conversations. In responding to those questions, Adams did not hesitate to inform his examiner that he could not recall the answer to the questions posed. For the most part, however, Adams had few problems at his deposition remembering events, occurrences, or conversations relevant to his case. Given the foregoing, it is significant that Adams seemed to easily recall and testify to information at his deposition which he now argues should be given "little weight" because of "memory loss" problems.

Finally, based on the record before the Court, Adams alleged "memory problems" occurred on April 10, 1996, the date of his deposition. If, in fact, there is a medical correlation between depression and memory loss (a correlation not found in the record before the Court), then Adams' problems at his deposition indicate only that he was depressed in April, 1996 and not that he suffered from a "mental impairment" at the time he was terminated from RGH.

In sum, Adams has failed to produce sufficient evidence from which a reasonable jury could find that (1) he had a "mental impairment" at the time of his discharge from RGH and (2) that such "mental impairment" substantially limited his ability to work at the point in time when he was fired. Accordingly, Adams is not disabled within the meaning of the ADA.

**2. *Adams is not a "Qualified Individual" Under the ADA:*** Even if Adams were able to show that he had a disability within the meaning of the ADA, summary judgment would nonetheless be appropriate because Adams is unable to demonstrate the second essential element of a *prima facie* case under the ADA: that he is "otherwise qualified" to perform the job in question.

To determine whether Adams was "otherwise qualified" to do the job of a hospital "BIOTEC," the Court must conduct a two part analysis. First, it "must be determined whether the plaintiff can perform the essential functions of a particular job despite his handicap, and if not, whether the employer could reasonably accommodate the employee so that he could perform the essential functions despite his handicap." *Husowitz v. Runyon,* 942 F.Supp. 822, 833 (E.D.N.Y. 1996). Adams bears the burden of proving he is "otherwise qualified" for his job. *Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 138 (2d Cir.1995).

A disabled individual is not "otherwise qualified" for a particular employment position if such individual poses a "direct threat" to the health or safety of others which cannot be eliminated by a reasonable accommodation. *Altman v. New York City Health and Hospitals Corp.,* 903 F.Supp. 503 (S.D.N.Y.1995), *aff'd,* 100 F.3d 1054 (2d Cir. 1996). A "direct threat" is a "significant risk of substantial harm to the health or safety of the individual or others." 29 C.F.R. 1630.2(r). Where the record demonstrates that an employee poses a significant risk to the health and safety of others which cannot be eliminated by reasonable accommodation,

summary judgment in favor of the employer is appropriate. *See e.g. E.E.O.C. v. Amego, Inc.,* 110 F.3d 135 (1st Cir.1997) (affirming summary judgment against employee who suffered from depression and therefore was unqualified to perform job that required administering and monitoring medication for severely disabled residents of group home); *Doe v. University of Maryland Medical System Corp.,* 50 F.3d 1261 (4th Cir.1995) (neurosurgery resident who tested positive for HIV was not an otherwise qualified individual with a disability; summary judgment order affirmed); *F.F. v. City of Laredo,* 912 F.Supp. 248 (S.D.Tex.1995) (summary judgment granted against bus driver who suffered from bi-polar mental disorder because his handicap posed a significant safety risk and therefore was not "otherwise qualified" for job).

Applying the principles set forth above, it is clear that Adams was not "otherwise qualified" for the BIOTEC position at the time he was terminated. The nature of Adams' essential job functions are not in dispute. As a hospital BIOTEC, Adams was responsible for (1) providing operation assistance for clinical procedures and (2) inspecting, maintaining, calibrating and repairing hospital equipment. (RGH's 56 Stm. Ex. 4). Thus, an essential function of Adams' job was to maintain and repair equipment which the hospital used daily to sustain, save, or improve patient's lives. Since negligent repairs are difficult if not impossible to detect, Adams was expected to perform his job responsibilities independently and carefully.

Between January 27, 1994 and April 19, 1994 Adams was cited for three separate instances of incorrectly repairing equipment used to care for hospital patients. The first two incidents involved "thermia units" [thermal blankets]. On both occasions, Adams failed to properly inspect and repair the units and returned them to hospital service despite the fact that they were not operating properly. Upon discovering the first negligent repair, Adams' supervisor (Marchese) gave him a verbal warning. Upon discovering the second error, Marchese gave Adams a written "Record of Warning" which specifically advised Adams that his continued failure to properly inspect and repair equipment could result in termination. Adams read and signed the first written warning acknowledging its factual accuracy. At his deposition, Adams admitted that he had failed to follow departmental policies and procedures in inspecting and repairing the thermia units. (Adams deposition at page 63.)

The third alleged infraction occurred on April 19, 1994 and involved a malfunctioning syringe pump used to feed infants. The pump had recently been repaired by Adams. After investigating the nature of the repairs Adams had completed, Marchese determined that Adams had improperly replaced a broken part with an obsolete part from another pump instead of waiting for the new part to arrive. Again, Adams received a written warning detailing the incident which Adams once again signed without comment or dispute. Although he testified at his deposition that he felt pressured into signing the warning, he conceded that "maybe" his repair of the pump violated department practices and procedures.[2] (Adams deposition at page 63.) The essential functions of Adams' job included being able to carefully inspect and competently repair equipment used by RGH to care for its patients. The record is clear that between January and April, 1994 Adams exhibited severe deficiencies in performing an essential function of his job. Moreover, Adams' inability to perform his job posed a "direct threat" to the safety of patients at

---

**2.** Adams' deposition testimony as to the "fairness" of being reprimanded for the repairs of the syringe pump is not a sufficient factual dispute to allow plaintiff to avoid summary judgment. Even assuming that Marchese incorrectly charged Adams with the mistake, Adams produced no evidence that Marchese's "rush to judgment" was indicative of discrimination on the basis of Adams' alleged disability. It is undisputed that Marchese was informed that the syringe was not working and that Adams acknowledged the mistake. Whether or not Adams correctly replaced the part on the syringe is not dispositive. It was reasonable for Marchese to conclude that Adams was not qualified for his job in light of Adams' previous errors. *See Shiflett v. GE Fanuc Automation Corp.,* 960 F.Supp. 1022, 1030 (E.D.Va.1997) (it is irrelevant whether ADA plaintiff was, in fact, guilty of job misconduct; it matters only that the employer subjectively believed it was so).

RGH. That fact that his problems may have stemmed in part from an alleged mental health condition does not excuse Adams' failure to perform the essential functions of his job. *See Little v. FBI,* 1 F.3d 255, 259 (4th Cir.1993) (employee may be fired for misconduct even if the misconduct is attributable to underlying disability).

Adams argues that even if he was incapable of performing his job, with "reasonable accommodations," any threat to patient safety could have been eliminated. According to Adams' counsel, the reasonable accommodation that RGH should have offered was "time off." Adams' position is fundamentally flawed in two respects. First, Adams never requested an accommodation *at the time he was working.* It is an employee's burden to inform his employer not only of his alleged disability but also about his need for assistance and to suggest a reasonable accommodation. *See Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 139–141 (2d Cir.1995) (plaintiff bears burden to suggest that a reasonable accommodation is available); *Willis v. Conopco, Inc.,* 108 F.3d 282, 284–285 (11th Cir.1997) (plaintiff bears burden to identify reasonable accommodation—ADA does not require employer to investigate accommodation before termination). Here, it is undisputed that Adams never requested an accommodation. Moreover, the record is clear that Adams never mentioned to RGH that his depression was affecting his ability to do his job. Employers are not required to be clairvoyant as to hidden medical problems of their employees and provide assistance where none is requested. *See Miller v. National Cas. Co.,* 61 F.3d 627, 629 (8th Cir.1995) ("[b]efore an employer must make accommodation for the physical or mental limitations of an employee, the employer must have knowledge that such a limitation exists"). Adams' eleventh hour argument that he could have performed his job with "time off" is not sufficient to infer that RGH discriminated against Adams by its failure to provide such accommodation. *Fussell v. Georgia Ports Authority,* 906 F.Supp. 1561, 1570 (S.D.Ga.1995) ("it is simply too late to raise suggested accommodations two years later in a summary-judgment response brief") *aff'd,* 106 F.3d 417 (11th Cir.1997).

Second, even if Adams had made a timely request for "time off," he has failed to demonstrate how such "time-off" would have allowed him to perform the essential functions of his job and whether an unspecified amount of time off was a "reasonable" accommodation given his job responsibilities. While a "modified work schedule" is an accommodation specifically contemplated by the ADA, 42 U.S.C. § 12111(9)(B), elimination of an essential function of the job is not. *See e.g. Gilbert v. Frank,* 949 F.2d 637, 644 (2d Cir.1991) (reasonable accommodation "does not mean elimination of any of the job's essential functions"); *Aquinas v. Federal Exp. Corp.,* 940 F.Supp. 73, 79 (S.D.N.Y. 1996) ("permission to work only when [plaintiff's] illness permits" is not a reasonable accommodation); *Johnson v. Foulds,* 1996 WL 388412, *5 (N.D.Ill.) (depressed plaintiff's demand for an indefinite leave of absence from work was not a reasonable accommodation under the ADA), *aff'd,* 111 F.3d 133 (7th Cir.1997). Moreover, errors made by employees in the BIOTEC position are difficult to detect and carry potentially life threatening consequences. Given Adams' string of errors, requiring RGH to hire an employee just to review and oversee Adams' work would not be a reasonable accommodation. *See Ricks v. Xerox Corp.,* 877 F.Supp. 1468, 1477 (D.Kan.1995) (ADA does not require an employer to hire a full-time helper to assist a disabled employee as a reasonable accommodation).

Because Adams failed to timely request a reasonable accommodation and failed to show how "time off" would have permitted him to perform the essential functions of his job, his ADA claim must fail.

**3. *Adams Was Not Terminated Because of His "Disability":***

The third and final element of a *prima facie* case of disability discrimination in violation of the ADA is that the employee must show that the challenged job action was taken solely by reason of the employee's disability. Here too, Adams' proof falls far short of establishing a *prima facie* case of discrimination.

**236**

In order for an employer to fire its employee because of a disability, the employer must "at the very least ... have knowledge of the disability." *Kolivas v. Credit Agricole,* 1996 WL 684167, *3 (S.D.N.Y.); *See also Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186, n. 13 (6th Cir.1996) (plaintiff must show employer had knowledge of disability); *Morisky v. Broward County,* 80 F.3d 445, 448 (11th Cir.1996) (plaintiff can not prove discrimination without showing employer knew of disability); *Hedberg v. Indiana Bell Telephone Co.,* 47 F.3d 928, 931–934 (7th Cir.1995) (employer must have knowledge of disability in order to impose liability under ADA); *Estwick v. U.S. Air Shuttle,* 950 F.Supp. 493, 503 (E.D.N.Y.1996) ("plaintiff must present some evidence that the employer knew that the plaintiff suffered from a disability").

In the instant case, it is undisputed that Adams (1) never informed Marchese or any supervisor at RGH that he was suffering from depression, (2) never asked or arranged for RGH to receive medical information about his alleged disability, and (3) never informed Marchese or any supervisor at RGH that he visited the hospital emergency department on January 20, 1994 because he was feeling "nervous" and "depressed."

Despite the fact that he failed to inform his employer about his alleged impairment, Adams claims that RGH should have known about his disability because in early 1994 he was behaving "strangely" at times and made three mistakes in his work. However, "[a]n employer is not obligated to observe employees for any behavior which may be symptomatic of a disability, and then divine that the employee actually suffers from a disability." *Lippman v. Sholom Home, Inc.,* 945 F.Supp. 188, 192 (D.Minn.1996). Adams' alleged "strange behavior" and negligent work performance could be attributable to many things besides an ADA covered disability. It simply is not reasonable to expect RGH to infer that Adams suffered from a mental disability which the ADA would require the hospital to accommodate from the limited proof of "strange behavior" and performance problems found in the record. *See*

*Miller v. National Cas. Co.,* 61 F.3d 627, 629–630 (8th Cir.1995) (it is plaintiff's obligation to inform employer about mental illness; employer is not obligated "to divine the presence of a disability" from an employees bad work habits or from a "stressful family situation"); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 934 (7th Cir.1995) ("[t]he ADA does not require clairvoyance"); *Lippman v. Sholom Home, Inc.,* 945 F.Supp. at 192. ("[T]he ADA does not place upon the employer the burden of determining why an employee fails to perform satisfactorily").

Furthermore, even if Adams could establish that RGH knew or should have known that he had a covered "mental impairment," Adams still would be unable to show that his firing was a discriminatory act by RGH. Adams has conceded that he violated RGH's policies and procedures. Pursuant to the RGH personnel manual, such violations were cause for termination. (*See,* Exhibit "7" annexed to Docket # 9). Discrimination under the ADA is not established if the disability caused unacceptable job performance. *Cowan v. MaBSTOA,* 961 F.Supp. 37, 41 (E.D.N.Y.1997). *See also Teahan v. Metro–North Commuter Railroad Co.,* 951 F.2d 511, 516 (2d Cir.1991) ("If the consequences of the handicap are such that the employee is not qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing is solely by reason of the handicap"); *Adamczyk v. Chief, Baltimore County Police Dept.,* 952 F.Supp. 259 (D.Md.1997) (employer does not discriminate when disciplining employee for violation of employers own rules and regulations, even if misconduct was caused by disability).

While RGH may be guilty of making a swift and unfavorable employment decision, the ADA does not protect Adams unless the decision reflects discrimination based upon a disability. Because Adams cannot show that RGH fired him "because of" his disability, his ADA claim must fail.

### CONCLUSION

For the foregoing reasons, defendants motion for summary judgment is **granted** and

plaintiff's complaint is hereby dismissed.[3]

**SO ORDERED.**

---

**3.** The Court chooses to exercise its discretionary supplemental jurisdiction over plaintiff's NYHRL claim, 28 U.S.C. § 1367(c)(3), and dismisses that claim as well. The NYHRL is interpreted and analyzed in a substantially similar manner as the ADA. The same three elements are required to establish a *prima facie* case under the NYHRL as is required under the ADA. N.Y. Exec. Law § 296(1)(a); *McEniry v. Landi*, 84 N.Y.2d 554, 620 N.Y.S.2d 328, 644 N.E.2d 1019 (1994); *See also, Aquinas v. Federal Express Corp.*, 940 F.Supp. 73, 79 (S.D.N.Y.1996) (NYHRL "mirrors" plaintiff's ADA claim). Since plaintiff failed to satisfy any of the three essential elements of a *prima facie* ADA claim, his NYHRL claim fails as well.